IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 5:21-cr-009-20 |
| | ) | |
| BRETT DONAVAN BUSSEY, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS WIRETAP EVIDENCE (DOC. 651)

The United States moves the Court to deny Defendant Brett Bussey's motion to suppress wiretap evidence because: there was probable cause to establish that Bussey was using the target telephone in connection with the commission of federal violations of the law, and there was a need to use the Court authorized wiretaps because normal investigative procedures have been tried and failed or reasonably appeared unlikely to succeed. Because there were no material misrepresentations or omissions, Bussey's request for a *Frank's* hearing should be denied; and this Court should deny his motion to suppress without an evidentiary hearing.

1. **General standards relating to wiretaps:**

Probable Cause: The probable cause showing for a wiretap affidavit is identical to the showing of probable cause that is required for a search warrant. *United States v. Nixon*, 918 f.2d 895, 900 (11th Cir. 1990). A judge evaluating a wiretap application makes "a practical, common-sense decision 'about whether the totality of the circumstances' indicate that there is probable cause that the sought-

for evidence will be obtained." *Id*. pg. 900 quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Deference should be given: There is a deferential review of probable cause in a suppression context. The reviewing court should not review the affidavit *de novo* for probable cause. *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984). The court's task is "simply to ensure that the magistrate (or judge) had a substantial basis for… concluding that probable cause existed." *Id*. The practical nature of evaluating probable cause in a wiretap application "justifies great deference' upon review and calls for upholding the judge's findings even in marginal or doubtful cases." *Id*. In fact, "reasonable minds may differ on the question of whether a particular affidavit establishes probable cause' for a wiretap. … Thus, the fact that a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant." *Spinelli v. United States*, 393 U.S. 410 410 (1969). The issuing judge is "clothed with broad discretion in [his/her] consideration of the application." *United States v. Harden*, 2023 WL 3933373 (SDGA 2023) citing *United States v. Alonso*, 740 F.2d 862, 868-69 (11th Cir. 1984).

Defendant has the burden to show invalidity: A wiretap order, like a search warrant, is presumed valid, placing the burden of persuasion to establish its invalidity firmly upon the defendant. *United States v. Weber*, 808 F.2d 1422, 1424 (11th Cir. 1987)(*per curiam*), *United States v. Graham*, Case No. 2:20-cr-47, 2021 WL

2593630, at *15 (SDGA 2021). In reviewing probable cause and necessity, the Court should look at the four corners of the affidavit.

> 2. **The Court found probable cause to issue a wiretap in this case and the Court's finding should be given deference.**

On October 18, 2019, upon application of the United States, supported by an 81-page affidavit by Homeland Security Investigations Special Agent Anthony Miranda, United States District Judge Lisa Godbey Wood entered an order authorizing the interception of Target Telephone 1, used by Defendant Bussey. Exhibit 1a. In the order, the Court specifically found there was probable cause to believe that Bussey and others committed or are committing several violations of federal law, including wire fraud, forced labor, trafficking with regard to forced labor, among other crimes (Target Offenses). Exhibit 1a, ¶1. The Court also found probable cause to believe that the particular wire and electronic communications of Bussey and others will be obtained through the interceptions and that the communications will concern the specifics of the target offenses. *Id.* ¶¶3-4.

As found by the Court, the 81-page affidavit establishes probable cause. Recognizing "probable cause is a fluid concept- turning on the assessment of probabilities in particular factual contexts," the affidavit provided sufficient evidence justifying the Court's probable cause finding, thus this Court should give the finding great deference. *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). The affidavit outlines the target crimes (Exhibit 1 ¶4), the evidence sought to be obtained (¶6-7), the basis of information (¶ 8-9), the subjects (¶11), information about the CS (¶14-16) the facts establishing probable cause (¶ 17-131), among other things.

3

With regard to probable cause, Title 18 United States Code, Section 2518(3) provides that a wiretap application must establish:

a. probable cause to believe that an individual is committing, has committed, or is about to commit an enumerated offense;

b. probable cause to believe that particular communications concerning the offense will be obtained through such interception;

d. probable cause to believe that the target phone is being used, or is about to be used, in connection with the commission of such offense.[1]

In this case, the Court found probable cause and issued an order authorizing the wiretap. **First, agents established that the phone was being used by Bussey**. Exhibit 1, ¶¶ 4, 122, 123, 128, 129. Agents confirmed the phone was registered to Gerald Bussey; and then confirmed via the CS and recorded calls that the phone was being used by Brett Bussey. **Agents confirmed that Bussey was involved in a conspiracy with others to violate multiple enumerated federal laws related to the H-2A Visa Program**.

As noted in paragraphs 19-37, the H-2A visa program is a lawful program that allows farmers to use migrant workers to work in approved agricultural farms for a specific time period, conditioned on certain hard line rules. Truthful paperwork must be submitted to and approved by the government. The paperwork is submitted and signed under penalty of perjury. The program requires workers to work at identified

---

[1] Section c requires a showing that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous. This section will be addressed in the necessity section of this response.

4

pre-approved locations. The workers must be provided transportation to and from the approved locations. The workers must be housed in suitable, pre-approved housing. The workers cannot be charged a fee to apply for the program. Once in the US, the workers must work in accordance with the pre-approved contract and must be paid US wages in accordance with the contract. Workers cannot be sold or transported to non-approved locations. If a migrant worker absconds, the employer has a duty to report the absconder. Workers must be provided with transportation back to the home country at the conclusion of the time period. There are other requirements outlined in the affidavit. *Id.*, ¶¶19-37.

In this case, the affidavit establishes that there was probable cause that an individual is committing, has committed, or is about to commit a violation of the enumerated offense. In this case, conspirators, including Bussey, were part of a transnational criminal organization (TC0) that fraudulently used the H-2A program to smuggle Mexican nationals into the United States under the pretext of being agricultural workers. This TCO unlawfully charged Mexican nationals a fee or smuggling debt to obtain the H-2A Visa. The organization bribed Georgia Department of Labor employees to unlawfully approve housing. The organization did not pay the workers pursuant to the terms of the contract, moved the workers to unapproved locations, and held workers' identification documents to pay off debts. ¶¶ 39 and 40.

The affidavit established probable cause that Bussey was a member of this conspiracy:

-Bussey submitted at least three fraudulent petitions seeking migrate workers under the H-2A program. In addition, the Department of State refused 833 visas associated with Bussey petitions because of inaccurate or incomplete information. ¶ 42.

-Bussey submitted a document claiming that the place of employment for 250 migrant workers would be 224 Meadow Road, Alma, GA. ¶ 43.

-The government emailed a notice of deficiency to Bussey at his listed email address. Bussey replied with documentation, again claiming the workers would work at 224 Meadow Road, Alma, GA. ¶ 44.

-Investigators learned that the property, 224 Meadow Road, Alma, GA, belonged to Katelyn Alderman, who advised that neither she, nor her husband, ever requested or needed any H2A workers for this property. ¶ 45.

As noted in the affidavit, Bussey discussed his knowledge about other members of the conspiracy and the scheme to defraud the government. **There was probable cause to believe that the target phone was being used, or about to be used, in connection with commission of the listed offenses**.

-Bussey had multiple conversations with a confidential source wherein Bussey discussed the fraud. ¶¶ 122-131.

-On August 15, 2019, Bussey used the Target Telephone to help set up a meeting with CS. The CS contacted Bussey to coordinate a time to meet. ¶¶ 122, 123.

-On August 20, 2019, the CS and Bussey met. The recorded conversation demonstrates Bussey's involvement.

-Bussey admitted knowing that co-conspirator Gomez was crooked and would accept bribes to pass housing inspections. Bussey knew that Gomez charged between $2000 and $6000 to pass inspection. ¶ 126.

-Bussey admitted knowing a "big honcho" in Mexico who charges the workers a "gigantic fee." ¶ 126.

6

-Bussey stated that for 150 workers, he could be making upwards of $100,000 in cash. ¶ 126.

-Bussey explained the scam. "the farmer may need 75-100 workers, they are going to charge some of them less, but when the crew leader has the contract, does the write up, he is going to ask for 175 workers to 200 workers. He's going to keep those 75 to 100 to work, the other ones he's going to sell the visas and make $4000 a pop on those extra ones." ¶ 126.

-Workers will carry anywhere from $2000 to $4000 with them when they get to the United States. ¶ 126.

-Bussey laughed and told the CS that "but its not drugs or anything like that, if at all. **It's basically human trafficking**. ¶ 126.

-Bussey admitted that he gets "a piece" from doing the contracts for the crew leaders. ¶ 126.

-Bussey explained some of the roles of conspirators. He explained that Rojas brings in workers using her family. He explained: "she is kind of like one of the main ones, but she doesn't want to bring them under her name. She brings them in her cousin's name, her uncle's name, or anything like that." ¶ 126.

-Bussey admitted knowing that some of the migrant workers are not being housed where they should be housed, in violation of the law. Bussey explained that **some of the workers may be sold to people in Florida.** He explained that **people are sold for $2000, $3000 a piece** to this guy in Florida. If audited, he could say they ran away, and he did not know where they went. ¶ 126.

The affidavit outlined a recorded call between the CS and Bussey that happened on September 30, 2019. Bussey was using Target Telephone 1. ¶ 128. In that call Bussey stated:

-Bussey traveled to Mexico to meet with officials at the consulate's office to help get foreign nationals into the United States. ¶ 129.

-Bussey gave advice to the CS regarding how much to charge for a housing letter to document that workers would be staying at the CS's hotel during their H-2A presence. Bussey recommended the CS to charge $10,000 up front, but to return $3000 if no one actually stays at the location. ¶ 129.

7

In addition to the phone being used to talk to the CS and to coordinate meetings with the CS to discuss the illegal scheme, toll records demonstrate that Target Telephone 1, being used by Bussey, was in frequent contact with co-conspirators whose roles were outlined in the affidavit. ¶¶ 41-121. The toll records show (among other things)

> -90 calls and 188 messages to and from a phone associated with I. Strickland, during time period August 16, 2019, to September 8, 2019. ¶ 131.
>
> -35 calls and 188 messages to and from a phone associated with conspirator Ismael Perez. ¶ 131.
>
> -190 calls and 10 messages to and from a phone associated with coconspirator Rojas. ¶ 131
>
> -59 calls to and from a different phone associated with Rojas. ¶ 131
> -34 calls to and from a phone associated with conspirator Alvarez. ¶ 131
> -30 calls to and from a phone associated with conspirator JC Castro. ¶ 131
> -3 calls and 85 messages to and from a phone associated with conspirator Jorge Gomez. ¶ 131

The affidavit has sufficient probable cause to justify the District Court's findings. In his motion to suppress, Bussey attempts to supplement the record by providing additional information (outside the four corners of the affidavit). Bussey attempts to explain away probable cause by providing innocent explanations. This does not negate probable cause. "Innocent behavior frequently will provide the basis for a showing of probable cause." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983); *United States v. Robinson*, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995). As noted in *United States v. Gonzales,* 969 F.2d 999 (11th Cir. 1992), "[t]hese maneuvers may be open to

8

innocent explanations,…[but] [c]onduct innocent to the eyes of the untrained may carry entirely different messages' to the experienced or trained observer.") The opinions and conclusions of an experienced agent may properly be considered as a factor in the totality of the circumstances when evaluating whether probable cause exists. *Id.*

Bussey asks the Court to discredit the information that was provided by the confidential source because the CS had a significant criminal history and because the CS drank alcohol with Bussey. Bussey also claims the affidavit contains false statements and material omissions. For example, Bussey argues: "The affidavit sates that Bussey "used Target Telephone to arrange for a meeting to discuss the CS's role and involvement with the TCO involving the Target Offenses." Bussey states: "That statement is false." Doc. 651, pg. 8. The government disagrees. Bussey used the target telephone to coordinate a meeting with the CS. The CS contacted Bussey on the target phone and they discussed and arranged a meeting. See Exhibit 1, ¶¶122, 123. As noted in the affidavit, there were multiple times where the CS and Bussey used the target phone to arrange a meeting, or to discuss the conspiracy.

Bussey attempts to negate probable cause by claiming that the CS provided Bussey with a "troubling" amount of alcohol. While it may be true that the CS and Bussey drank alcohol, this was not at the direction of law enforcement, and as evidenced by the recording, and noted in the affidavit, Bussey freely and voluntarily drank the alcohol.[2] The alcohol did not cause him to join a criminal conspiracy, did

---

[2] The agents did not direct the CS to drink with Bussey and ultimately called the CS during the meeting to stop it from continuing.

9

not cause him to admit his involvement in the conspiracy and did not negate any probable cause. Agents intentionally ensured the meetings and phone calls were recorded to corroborate statements made by the CS. Agents reprimanded the CS when he had an unmonitored contact with Bussey. That unmonitored contact was not used to establish probable cause.

The use of confidential informants is not a new phenomenon. For decades investigators have used informants to gather information about criminal activity. Under the *Gates* analysis with regard to confidential informants, the "veracity" and "basis of knowledge" prongs for assessing the usefulness of an informant's information, are relevant considerations in the totality of the circumstances analysis that traditionally guides probable cause determinations. *Illinois v. Gates*, 462 U.S. 213, 232 (1983). In the case at hand, agents corroborated the information by recording the interactions. The CS knew Bussey because he had an established relationship with him. The veracity is confirmed by the recording. While the informant may have a criminal history, the affiant took steps to disclose the history to the Court in the affidavit. The affiant listed the known convictions so the Court could assess his/her credibility. Bussey argues that the affiant omitted a sex offense conviction from 2000. The affiant believed these convictions were the same incident, because Bussey was indicted in 1999 and convicted in 2000. Any misstatement was accidental, not intentional, and not intended to deceive the Court. The CS's history does not negate the probable cause. Bussey admitted in the recording that what they

were doing "was basically human trafficking." ¶ 126. The other evidence corroborates this.

### 3. There were no material misrepresentations or omissions in the Affidavit that negate probable cause or justify a *Franks* hearing.

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court stated:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses must be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted- is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail, of course, is another issue.

*Franks*, 438 U.S. at 171-72. The burden of proof, by a preponderance of the evidence is on the defense. *Id.* In this case Bussey must prove: 1) that the alleged misrepresentations or omissions were knowingly or recklessly made by the affiant, Agent Miranda, and 2) that the result of excluding the alleged misrepresentations and including the alleged omissions would have been a lack of probable cause for

issuance of the warrants. *United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir. 1990). Bussey has failed to meet the burden.

Bussey alleges the government failed to provide the "troubling facts underlying the CS's sexual assault conviction, including the fact that there is also a nolo plea for a sexual assault in 2000." Further alleged: "the affidavit does not note the details of the CS's gun arrest and conviction." In the case at hand, the affiant disclosed the CS's known criminal history as follows: "the CS has criminal convictions for sexual assault in Texas in 1999, fugitive from justice for failing to register as a sex offender in Texas in 2006, possession of a firearm by a convicted felon in Georgia in 2007, and DUI and impersonating a public official in New York in 2013. Exhibit 1, ¶ 14. In the case at hand, the agent disclosed the known convictions to the Court. There is no evidence that the agent omitted the facts deliberately in order to mislead the reviewing judge or did so recklessly. The purpose of disclosing the known criminal history to the Court is to help the Court weigh the credibility of the informant. In this case, the agent disclosed the known criminal history and corroborated the information provided by the informant by recording the conversations. The recordings speak for themselves. In *United States v. Novaton*, 271 F.3d 968 (11th Cir. 2001), the Court initially rejected a motion for a *Franks* hearing when the agent did not disclose the full criminal history of an informant, and incorrectly attributed a different conviction. The Court denied the motion to suppress, finding that the evidence was sufficiently corroborated by other evidence, and that any omissions

concerning prior criminal history were immaterial and "frivolous." *Id.*, at 988. Therefore, the government moves the Court to deny Bussey's motion on this ground.

Bussey also argues that the affiant withheld information about meetings between Bussey and the CS; misinterpreted parts of those meetings, "got Bussey drunk," and that Bussey should be entitled to a *Franks* hearing. The allegations are without merit. While there may be alternative interpretations that Bussey wants to present to the Court about what he did and why he made certain admissions on tape, these alternative interpretations and arguments are better suited for a trial, not a *Franks* hearing.

An affiant has no duty to present every bit of information to the Court to justify a warrant and/or wiretap. Like a warrant, wiretap applications require evidence establishing probable cause. To establish probable cause, the record must demonstrate "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462, U.S. 213, 238 (1983). In the case at hand, the affiant specifically stated:

> Since this Affidavit is being submitted for the limited purpose of securing authorization for the interception of wire and electronic communications, I have not included each and every fact known to me concerning this investigation or every aspect of the investigation to date. I have set forth only the facts that I believe are necessary to establish the foundation for probable cause for an order authorizing the interception of wire and electronic communications.

Exhibit 1, ¶ 10. The Court reviewed the affidavit and found probable cause. Because the omissions (if any) were not knowingly or recklessly made to mislead the Judge,

and because they have no impact on the probable cause determination, this Court should deny the motion for a *Franks* hearing.

### 4. Necessity: There was a need for the wiretap.

Title III requires that a wiretap application must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be dangerous." 18 U.S.C. § 2518(1)(c). The government's burden of showing necessity is not high. Section 2518 must be read in a common-sense fashion. This necessity requirement is "simply designed to assure the wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime. *United States v. Kahn*, 415 U.S. 143 (1974). The purpose "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Pacheco*, 489 F.2d 554 (5th Cir. 1974). The government does not need to show a "comprehensive exhaustion of all possible investigative techniques. *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984). Simply because a defense lawyer "is able to suggest post factum some investigative technique that might have been used and was not," does not justify suppression. *Id.* at 869.

In this case, the Court found necessity. After reviewing the affidavit, the Court found:

> In particular, there is probable cause to believe that these communications will concern the specifics of the Target Offenses,

14

including (a) the full scope, duration, and methods utilized by the Target Subjects and others in a human trafficking, human smuggling, and visa fraud transnational criminal enterprise (TCO); (b) identify all members of the TCO and other conspirators in the above described illegal activities; (c) identify victims of forced labor and labor trafficking; (d) identify amount and location of all illegal proceeds from the above described illegal activities; (e) identify conspirators financing the criminal activity; (f) identify the dates, times, places and manner for the commission of the above-referenced offenses, including the roles and responsibilities of each of the Target Subjects and others yet unknown; (g) identify the locations and items used in furtherance of the above-described illegal activities; (h) identify the location and existence of records, assets and contraband associated with the above-described illegal activities; and (j) obtain admissible evidence that will demonstrate beyond a reasonable doubt that the individuals identified above and others yet unknown committed the offenses referenced herein. In addition, the communications are expected to constitute admissible evidence of the commission of the Target Offenses.

The Court also found:

It has been adequately established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ.

See Exhibit 1a, Order.

The Court's findings should be given deference. As noted in the affidavit agents conducted a thorough investigation using normal investigative procedures, but they could not accomplish the goals of the investigation without a wiretap. Exhibit 1, ¶¶ 132-174. The affiant identified various techniques that were used or could not be used and why. **Agents used confidential sources**. However, the confidential sources did not have contact will all members of the conspiracy. The sources did not know all members of the conspiracy in Georgia and other states, did not know all of the victims or their whereabouts, did not know the financiers of the operation, the roles of all

15

conspirators, the location of assets, among other things. While the sources were helpful, their information was insufficient to accomplish the goals of the investigation. Some of the sources were victims who are too afraid to provide information because they fear retribution. *Id.* ¶¶ 136-142.

**Agents conducted physical surveillance**, but this too, was insufficient to accomplish the goals of the investigation. Agents could not effectively surveil members of the transnational organization, nor its victims. Agents learned that in the last five years, this organization petitioned for over 50,000 foreign nationals to enter the United States. Many absconded, many were placed at locations different than listed on the paperwork, and several were sold or traded to others. The wiretap was needed to help identify when and where workers were entering the United States. ¶¶143-144.

Physical surveillance was difficult because many of the conspirators and victims were located at remote farms in South and Middle Georgia. Surveillance teams would be easy to detect, and as noted, were detected during a surveillance operation. On one occasion conspirators followed investigators and conducted counter-surveillance. ¶¶ 144-151.

Agents attempted to use an **undercover agent** but were unsuccessful. Further, even if the agents successfully embedded an undercover agent, he or she could not infiltrate the conspiracy at a level high enough to identify all members of the conspiracy. ¶¶ 152-154.

**Agents executed search warrants** and gathered evidence, but the warrants could not reveal the entire spectrum of the criminal operation. The wiretap was needed to help identify locations and items to search. ¶¶ 155-157.

**Agents conducted interviews and used the grand jury** as an investigative tool. While effective, interviews of cooperating witnesses and grand jury subpoenas have limits. One cannot identify all of the members of the transnational conspiracy. While the government could have attempted to interview targets in the grand jury, this would simply frustrate the investigation because the targets would know they were being investigated and would take extra efforts to avoid capture and prosecution. ¶¶ 158-163.

**Agents also conducted trash pulls, used pole cameras, reviewed toll records and subscriber information, used mail covers that identify senders and receivers of mail at specified locations, and conducted a substantial financial analysi**s, however, these tools were not enough for the reasons set forth in the affidavit. ¶¶ 164-174. The wiretap was needed to accomplish the goals of the investigation, and the Court agreed.

Bussey claims that "an affidavit that does not address Bussey's specific circumstances and inaccurately conveys the role of the CS cannot provide the necessity for a wiretap." Doc. 651, pg. 25. However, Bussey's argument is wrong. As noted in the affidavit, Bussey was one of many targets of this investigation. The goals were much broader than simply gathering evidence against Bussey. The affidavit specifically addressed Bussey's circumstances

17

with regard to probable cause. For example, he was captured talking about some members of the conspiracy, how the scheme worked, and that it was 'basically human trafficking." Exhibit 1, ¶ 126. Beyond the statements made to the CS, among other things, phone toll records demonstrated Bussey's contact with conspirators. ¶ 131. This specific evidence related to Bussey is incriminating, however, it was not sufficient to accomplish the goals of the investigation, including identifying all members of the conspiracy and the location of the victims.

Because the affiant demonstrated necessity, as the Court found, this Court should deny Bussey's motion.

**5.  The Good Faith Doctrine Applies**

The good faith doctrine applies to wiretap orders. *United States v. Makekzadeh*, 855 f.2d 1492, 1497 (11th Cir. 1988). Under the good faith exception, the Court will not suppress evidence obtained pursuant to a warrant unless (1) the issuing judge was knowingly misled by information the affiant knew, or should have known, was false; (2) the issuing judge "wholly abandoned his/her role;" (3) the application was so lacking indicia of probable cause to render reliance upon it unreasonable; or (4) the warrant was so facially deficient that reliance upon it was unreasonable. *United States v. Leon*, 468 U.S. 897, 923 (1984). The exclusionary rule is designed to deter unlawful police conduct. When law enforcement officers act in good faith and in reasonable reliance upon a judge's order, exclusion is not warranted because

there is no unlawful conduct to deter. *United States v. Travers*, 233 F.3dd 1327, 1329 (11th Cir. 2000). Bussey presents nothing to suggest that the good faith exception would not apply in this case. Thus, even if errors were made in the issuance of the wiretap orders or extension orders, the good faith exception apples and this Court should deny the suppression motion.[3]

                                            Respectfully submitted,
                                            JILL E. STEINBERG
                                            UNITED STATES ATTORNEY

                                            *s/ E. Greg Gilluly, Jr.*
                                            Assistant United States Attorney
                                            TN 019397

22 Barnard, Ste. 300
Savannah, GA, 31401
912-652-4422

---

[3] Bussey argues the fruit of the poisonous tree doctrine applies and that the Court should summarily suppress all evidence from the subsequent wiretaps if it suppresses the evidence on this wiretap. The government disagrees and moves the Court to deny the suppression motion on evidence procured via subsequent wiretaps because the subsequent wiretaps contained additional evidence, beyond that presented in the first affidavit.