# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### WAYCROSS DIVISION

UNITED STATES OF AMERICA,

    v.

BRETT DONOVAN BUSSEY,

    Defendant.

CASE NO.: 5:21-cr-9 -20

## REPORT AND RECOMMENDATION

Defendant Bussey filed a Motion to Suppress Wiretap Evidence.  Doc. 651.  This matter is fully briefed.  Docs. 885, 939.  I held a hearing on this Motion on April 19, 2024.  Doc. 1133 (hearing transcript).  Bussey's counsel and counsel for the Government appeared at the hearing, and the parties provided additional argument and evidence.  Id.  For the following reasons, I **RECOMMEND** the Court **DENY** Bussey's Motion to Suppress Wiretap Evidence, including Bussey's request for a <u>Franks</u> hearing.

## BACKGROUND

On October 18, 2019, the Honorable Lisa Godbey Wood authorized a wiretap permitting the Government to intercept communications to and from target telephone 1 ("TT1"), bearing a number ending in -4465, used by Bussey.  Doc. 651-2.  This wiretap request was supported by an 82-page affidavit signed by Special Agent Anthony Miranda of Homeland Security Investigations ("Agent Miranda").  Doc. 651-1.  In his affidavit, Agent Miranda described an investigation of Bussey and eight other target subjects.  These subjects were suspected of

exploiting foreign workers by fraudulently using the United States's H-2A visa program for a "transnational criminal organization." Id. ¶¶ 4–7.

In the affidavit, Agent Miranda identified nine target subjects, including Bussey, along with "others as yet unknown." Id. ¶ 6(c)(ii). Agent Miranda stated there was probable cause to believe Bussey was using TT1 in connection with target offenses, including wire fraud, forced labor, labor trafficking, visa fraud, and conspiracy. Id. ¶¶ 4–6. Agent Miranda stated Bussey had been identified as an individual using the H-2A visa program to smuggle Mexican nationals into the United States. Specifically, Agent Miranda stated Bussey was working with farm labor contractors as an agent to file fraudulent visa petitions for workers to enter the United States. Agent Miranda also stated Bussey was working with conspirators to recruit foreign nationals in Mexico to enter the United States by paying a fee or a smuggling debt and to apply for the H-2A visa program. Id. ¶ 11(a). Agent Miranda gathered information about Bussey and the other target subjects from many sources, including documents submitted in connection with the H-2A visa process, information gathered from witnesses, and a confidential informant. Id. ¶ 11.

Agent Miranda described documents that Bussey submitted in support of H-2A visa certifications. Agents determined that Bussey submitted three Form I-129 petitions for non-immigrant workers ("I-129 forms" or "petitions") with fraudulent information. Id. ¶ 42. Agent Miranda stated that the United States Department of State had refused 833 visas associated with Bussey's petitions because of inaccurate or incomplete information. Id.

Agent Miranda also described the investigation of an application for temporary employment certification, known as an ETA 9142, that Bussey submitted to the United States Department of Labor ("DOL"). Bussey submitted this application electronically on January 28, 2019. Id. ¶ 43. One of the places of employment was listed as 224 Meadow Road, Alma,

Georgia. Agent Miranda stated, "In order to show that need for workers, a letter was submitted on behalf of grower Cory Burnam, showing a fixed site address as listed in the ETA 9142. The letter was dated November 14, 2018 and signed by Cory Burnam." Id. Later, investigators discovered the property at 224 Meadow Road belonged to Katelyn Alderman. Id. ¶ 45. Katelyn Alderman did not request any temporary workers through the H-2A visa application process. Id. On February 4, 2019, Bussey also received a Notice of Deficiency ("NOD") in relation to this submission, which he responded to on February 8, 2019. Id. ¶ 44.

Agent Miranda also described the investigation of the other target subjects: Inez Jo Strickland, Ismael Perez, Donna Rojas, JC Castro, Twilla Reyes, Jesus Alvarez, Maria Patricio, and Jorge Gomez. Id. ¶¶ 46–121. The affidavit states that some of the target subjects submitted petitions and ETA 9142 applications with fraudulent or erroneous information. The affidavit also states that certain target subjects illegally exploited workers. The following is a sample of the factual allegations against the other target subjects:

1. Strickland, acting as an agent, filed an ETA 9142 that stated the H-2A workers would be housed at a motel, subject to an agreement with the motel owner. The motel owner later told investigators there was no agreement to house the workers. Id. ¶¶ 46–50.

2. Perez owned a labor contracting company for which Strickland had completed a petition. Foreign workers who entered under the petition reported abuse and H-2A program violations by Perez and others. Id. ¶¶ 51–57.

3. Rojas illegally charged workers for participating in the H-2A program, according to one of the workers. Id. ¶¶ 58–68.

4. Castro borrowed an H-2A worker from a blueberry farm to work on a corn farm without authorization and against work agreements. The worker died on the corn farm, according to the worker's sister. Id. ¶¶ 69–72.

5. Reyes was a farm labor contractor for two petitions that Strickland filed as an agent. Investigators found that Reyes received the worker visas she petitioned for, but the farms Reyes contracted for reported missing workers. Id. ¶¶ 73–75.

3

6.    Alvarez filed a petition as a farm labor contractor, but the farm listed on the petition did not receive all the workers who were issued visas.  Id. ¶¶ 76–81.

7.    Patricio submitted a number of petitions and ETA 9142 applications. Agents determined many of the petitions were fraudulent or inaccurate. Agents could not verify the information in the ETA 9142 applications.  Id. ¶¶ 82–90.

8.    Gomez was a Georgia DOL Employee who took bribes for approving farm labor contracts, according to an FBI informant.  Id. ¶¶ 114–21.

Agent Miranda explained that a confidential source ("CS") had provided information about a TCO committing human trafficking, human smuggling, and visa fraud.  Id. ¶ 14.  The CS had an extensive criminal history and, based on this history, he was subject to a travel restriction that prevented him from entering some foreign countries.  Agent Miranda explained that in exchange for cooperation, the CS requested monetary compensation and for his travel restriction to be lifted.  Law enforcement had not provided or promised the CS any compensation or benefit but anticipated providing monetary compensation at the end of his cooperation.  Agent Miranda stated the CS was credible and reliable.  Id. ¶¶ 15–16.

Agent Miranda described a meeting between the CS and Bussey on August 20, 2019, which was recorded by surveillance equipment.  Id. ¶¶ 122–27.  The affidavit states Bussey used TT1 to arrange the meeting with the CS.  Id. ¶¶ 122–25.  During the meeting, Bussey appeared to explain his role in the TCO, explained the role of two other target subjects (Gomez and Rojas), and explained how the CS could unlawfully profit from the H-2A visa program.  Id. ¶¶ 126–27. On September 30, 2019, the CS called Bussey on TT1 seeking direction on how to participate in the TCO's illegal scheme.  Bussey explained how the CS could profit illegally from the H-2A visa program and how the CS could further the TCO's illegal scheme.  Id. ¶¶ 128–30.

Agent Miranda provided an analysis of the telephone records for TT1 from January 1, 2019 through October 8, 2019.  Id. ¶ 131.  Agent Miranda obtained subscriber and toll details for

numbers belonging to the eight other target subjects through subpoenas. Agent Miranda described hundreds of calls and text messages between TT1 and telephone numbers belonging to the other eight target subjects. Id.

The affidavit contained a section titled "Need for Interception," in which Agent Miranda described the use of traditional investigative techniques and the insufficiency of such techniques. Id. ¶¶ 132–74. For example, he explained that although the confidential source had provided information, the source was not directly involved in the TCO and not privy to important information. Id. ¶¶ 136–42. Agent Miranda discussed how law enforcement could not rely on physical surveillance given the large number of workers and rural worksites involved in the investigation. Id. ¶¶ 143–51. Agent Miranda believed a wiretap of TT1 was necessary. Id. ¶ 134.

Bussey now moves to suppress evidence obtained under the wiretap order. Doc. 651. Bussey argues Agent Miranda's affidavit contains misrepresentations and omissions, and once these are addressed, the affidavit does not establish probable cause. Bussey argues the affidavit fails to establish any necessity for a wiretap. Bussey also moves for a hearing under Franks v. Delaware, 438 U.S. 154 (1978).

## LEGAL STANDARD

"Title III of The Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, sets forth numerous requirements the government must meet before electronic surveillance (wiretaps) may be authorized." United States v. Flores, No. 1:05-CR-558, 2007 WL 2904109, at *21 (N.D. Ga. Sept. 27, 2007). Under 18 U.S.C. § 2518, a wiretap application must include:

> a full and complete statement of the facts and circumstances relied upon by the applicant . . . including details as to the particular offense . . . , a particular

> description of . . . the type of communications sought to be intercepted, the identity of the person . . .whose communications are to be intercepted, and a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

United States v. Gonzalez Perez, 283 F. App'x 716, 720 (11th Cir. 2008) (alterations in original) (internal marks omitted) (quoting 18 U.S.C. § 2518(1)(b), (c)).  Upon a proper application, a district judge may issue an ex parte order authorizing the interception of wire communications if the judge finds probable cause to believe an individual is committing or has committed a qualifying offense; particular communications concerning that offense will be obtained through such interception; and the facilities from which, or the place where, the communications are to be intercepted are being used in connection with the offense, or are leased to, listed in the name of, or commonly used by such person.  United States v. Duarte-Rosales, No. 1:05-CR-197-6, 2008 WL 140665, at *2 (N.D. Ga. Jan. 11, 2008) (citing 18 U.S.C. § 2518(3)(a), (b), (d)); see also United States v. Robles, 283 F. App'x 726, 734–35 (11th Cir. 2008).

Applications for wiretaps must be supported by the same probable cause required for a search warrant.  United States v. Hyppolite, 609 F. App'x 597, 601 n.2 (11th Cir. 2015) (citing United States v. Nixon, 918 F.2d 895, 900 (11th Cir. 1990)).  Specifically, applications must be supported by probable cause to believe "an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of [Title 18]."  18 U.S.C. § 2518.  Section 2516 includes any offense connected to "the manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic drugs," as well as "any Federal felony."  18 U.S.C. §§ 2516(1)(e), 2516(3).  The determination of whether probable cause exists should be a "practical, common-sense decision" focused on whether the "totality of the circumstances" indicate there is probable cause the evidence sought will be obtained.  Hyppolite,

609 F. App'x at 601 n.2.  For a wiretap, the "information supporting probable cause should be sufficient enough for a determination the particular telephone number is being used in furtherance of unlawful activity."  Id. (citing United States v. Domme, 753 F.2d 950, 954 n.2 (11th Cir. 1985)).  Probable cause does not require overwhelmingly convincing evidence but only "reasonably trustworthy information."  Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996).  Finally, wiretap orders issued under Title III are presumed to be valid.  United States v. Weber, 808 F.2d 1422, 1423 (11th Cir. 1987).

To challenge the veracity of an affidavit in support of a search warrant, a defendant must make "'a substantial preliminary showing' that (1) the affiant deliberately or recklessly included false statements, or failed to include material information, in the affidavit; and (2) the challenged statement or omission was essential to the finding of probable cause."  United States v. Arbolaez, 450 F.3d 1283, 1293 (11th Cir. 2006) (quoting Franks v. Delaware, 438 U.S. 154, 155–56 (1978).  If the defendant meets both requirements, he is entitled to an evidentiary hearing on the issue.  At that hearing, the defendant must demonstrate, by a preponderance of the evidence, the existence of falsity or reckless disregard and must demonstrate that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause."  Franks v. Delaware, 438 U.S. 154, 156 (1978).

The requirements for making a substantial preliminary showing are "not lightly met." Arbolaez, 450 F.3d at 1294.  Negligent or insignificant false statements or omissions will not invalidate a warrant.  United States v. Reid, 69 F.3d 1109, 1114 (11th Cir. 1995).  Even so, intentional and reckless omissions will only invalidate a warrant "if inclusion of the omitted facts would have prevented a finding of probable cause."  Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997).

The defendant's burden is to show that "absent those misrepresentations or omissions, probable cause would have been lacking." United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009) (quoting United States v. Novaton, 271 F.3d 968, 987 (11th Cir. 2001)). "[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." Franks, 428 U.S. at 172.

In reviewing challenges to Title III intercepts, the court is mindful "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." United States v. Bourassa, No. 4:18-CR-3, 2019 WL 7559293, at *4 (N.D. Ga. July 25, 2019) (quoting United States v. Stokes, No. 96 CR 481, 1996 WL 727400, at *5 (S.D.N.Y. Dec. 18, 1996)). Moreover, "a wiretap order is presumed to be valid, and a defendant has the burden of overcoming the presumption and of proving that the wiretap order was unlawfully obtained." Flores, 2007 WL 2904109, at *22.

## DISCUSSION

Bussey contends Agent Miranda's affidavit contains several misrepresentations and omissions. I will first describe each of these misrepresentations and omissions, as characterized in Bussey's Motion. Next, I consider Agent Miranda's affidavit without the alleged misrepresentations and omissions and Bussey's request for a Franks hearing. In doing so, I consider whether Agent Miranda's affidavit would still support probable cause if it were "corrected" to address all of Bussey's allegations. Ultimately, even considering the "corrected"

affidavit, I conclude the affidavit would still support probable cause.[1]  Lastly, I address Bussey's necessity argument.

## I.    Alleged Misrepresentations and Omissions

Bussey contends that Agent Miranda's affidavit contains several misrepresentations and omissions.  First, Bussey argues Agent Miranda misrepresented the facts about the ETA 9142 application that Bussey submitted on January 28, 2019.  Doc. 651 at 7–8 (referring to ¶¶ 41–45 of Agent Miranda's affidavit).  Second, Bussey argues Agent Miranda omitted details about the CS's criminal history.  Id. at 11–12 (referring to ¶ 14 of Agent Miranda's affidavit).  Third, Bussey argues Agent Miranda omitted and misrepresented details about meetings and calls between Bussey and the CS.  Id. at 12–19 (referring to ¶¶ 41, 46, 122–23, 126–29, 131 of Agent Miranda's affidavit).

### A.    Alleged Misrepresentations and Omissions About the ETA 9142 Application

Bussey argues the affidavit contains misrepresentations and omissions about the ETA 9142 application he submitted to the DOL on January 28, 2019.  Specifically, Bussey argues the affidavit contains misstatements and omissions about Bussey's role as an agent in submitting the form.  Doc. 651 at 7–8 (referring to ¶¶ 41–45 of Agent Miranda's affidavit).[2]  Bussey also argues the affidavit omits information about a November 14, 2018 letter from Cory Burnam that was submitted with the ETA 9142 application.  Id.  Finally, Bussey argues the affidavit fails to

---

[1]    Because I conclude the affidavit would still support probable cause even if all the "corrections" were made, I do not need to determine whether the alleged misrepresentations and omissions were deliberately or recklessly made.

[2]    Bussey makes this argument in another motion to suppress.  Doc. 637 at 5–11.  He incorporates the argument in this Motion.  Bussey's arguments are identical.  Even so, I have given careful, individualized consideration to each motion.

explain that a Notice of Deficiency ("NOD") is standard practice under federal regulations. Doc. 637 at 10.

### 1.    *The H-2A visa process.*

A discussion of the H-2A visa application and admission process is helpful to understand Bussey's arguments related to the ETA 9142 application.  The following summary of the process comes from Agent Miranda's affidavit.  Doc. 651-1 ¶¶ 23–37.  This portion of the affidavit is largely undisputed.

Foreign nationals may obtain authorization to work for pay in the United States by obtaining an H-2A non-immigrant visa.  The visa must be sponsored by a qualifying employer in the United States.  The prospective employer must apply to the DOL for a temporary labor certification.  Then, the sponsoring employer must petition the United States Citizenship and Immigration Services ("USCIS") for authorization.  After the USCIS approves the authorization, the workers must apply for the H-2A visas at an embassy or consulate abroad.  Id. ¶¶ 23–24.

A farmer, agent, or farm labor contractor may complete the labor certification application with the DOL.  A certified farm labor contractor may apply as an employer using an ETA 9142 Application for Temporary Employment Certification.  The contractor must submit the name and location of each fixed-site agricultural business to which the contractor expects to provide workers, along with other information.  An employer or the employer's agent can submit the ETA 9142 electronically.  An electronically submitted ETA 9142 does not require an original signature at the time of submission.  However, it must be signed by both the employer and the employer's agent before final approval.  Id. ¶¶ 25–31.

Once the ETA 9142 is certified, the employer submits a Form I-129 Petition for Non-Immigrant Worker to USCIS.  An agent may file the petition.  The petition is signed by the agent

and signed by the employer under penalty of perjury. The petition must be mailed to a USCIS service center. Upon USCIS approval, an embassy or consulate abroad may interview foreign nationals and process their H-2A visa applications. Id. ¶¶ 32–37.

### 2.   Bussey's role in signing the ETA 9142.

Bussey argues that Agent Miranda's affidavit contains misstatements and omissions about his role in preparing and signing the ETA 9142. Doc. 637 at 5–10 (referring to ¶¶ 31, 41–45 of Agent Miranda's affidavit ).[3]  Agent Miranda stated in his affidavit that the employer and the employer's agent both must sign the ETA 9142 under penalty of perjury. Doc. 651-1 ¶ 33. Bussey argues this is incorrect: only the employer signs the ETA 9142 under penalty of perjury. Bussey argues the affidavit omits a detailed comparison between the agent's and the employer's certification.

Bussey provides a copy of the ETA 9142 in support of his argument, which contains the following employer certification:

> I hereby acknowledge that the agent . . . is authorized to represent me for the purpose of labor certification and, by virtue of my signature . . . below, I take full responsibility for the accuracy of any representations made by my agent or attorney.
>
> I declare under penalty of perjury that I have read and reviewed this application and that to the best of my knowledge the information contained therein is true and accurate.

Doc. 637-2 at 34. The agent's certification states:

> I hereby certify that I am an employee of, or hired by, the employer . . . and that I have been designated by that employer to act on its behalf in connection with this

---

[3]     As noted above, Bussey filed Document Number 637 as a separate motion to suppress a Microsoft search warrant, and he incorporates arguments from that motion here. The affidavit Bussey references in that motion, however, is organized slightly differently from Agent Miranda's affidavit. As such, all paragraph citations are to the affidavit relevant to this Motion, even though the argument in Document 637 is as to a separate motion. For example, the penalty of perjury clause is discussed at ¶ 18 of the affidavit concerning the Microsoft search warrant. The same clause is included in ¶ 31 of Agent Miranda's affidavit. Thus, when referencing Document Number 637's incorporated arguments as to ¶ 18 of the Microsoft affidavit, I will cite ¶ 31 of the wiretap affidavit.

application . . . .  I also certify that to the best of my knowledge the information contained herein is true and correct.  I understand that to knowingly furnish false information in the preparation of this form and any supplement hereto or to aid, abet, or counsel another to do so is a felony punishable by a $250,000 fine or 5 years in a Federal penitentiary or both (18 U.S.C. 1001).

Id. at 32.

Bussey argues the ETA 9142 certification shows he (as the agent) merely relayed information provided by the employer, who bears full responsibility for the accuracy of that information, but the affidavit omits this important fact.  Doc. 637 at 8–9.

### 3.    The worksite location on the ETA 9142.

Bussey asserts that the affidavit omits important details about the worksite location identified as 224 Meadow Road in the ETA 9142.  The 224 Meadow Road location is important because the owner of that property told investigators no workers had been requested or needed there.  Agent Miranda relied on this fact to demonstrate Bussey submitted ETA 9142 applications with fraudulent information.

Bussey's primary argument concerns the distinction between the street address—224 Meadow Road—and the geographic coordinates for the worksite.  Doc. 637 at 8 (referring to ¶¶ 41–45 of Agent Miranda's Affidavit); Doc. 1133 at 26–27.  The grower's letter, which was submitted with the ETA 9142, identified this particular worksite location by both geographic coordinates and by the street address, 224 Meadow Road.[4]  Doc. 637-4.  The ETA 9142 identified the worksite only by the street address—224 Meadow Road—and did not list any geographic coordinates.  Doc. 884-5 at 47.

---

[4]    The application and the grower's letter provided information for several worksites.  Bussey's challenge concerns only one: 224 Meadow Road.

Bussey argues the street address is an inaccurate worksite location that was mistakenly derived from the geographic coordinates provided by the grower. According to Bussey, the geographic coordinates from the grower's letter point to a location approximately 0.3 miles from 224 Meadow Road.[5] Doc. 651 at 8 n.4. Bussey made this determination by inputting the coordinates into Google Maps. Id. Doc. 1133 at 27. Bussey argues the affidavit fails to explain that the identification of 224 Meadow Road as a worksite location was a mistake, not a fraudulent submission. Id. In other words, the grower's letter points to a set of geographic coordinates, but the ETA 9142 identifies the worksite as the closest street address to those coordinates. Bussey maintains this was an error, and the employer—not the agent—is responsible for the error.

Bussey also contends the affidavit should have explained that the 224 Meadow Road location was only 1 of the 21 worksites identified in the ETA 9142 application and only 1 of 9 the worksites that the grower identified in his letter. Doc. 637 at 8 (referring to ¶¶ 41–45 of Agent Miranda's Affidavit); Doc. 1133 at 26–27.

Relatedly, Bussey challenges the affidavit's conclusion that the ETA 9142 application in question sought workers for a blueberry farm and agents determined blueberries were not grown at 224 Meadow Road. Specifically, the affidavit omitted contents of grower Cory Burnam's

---

[5]     In another filing, Bussey indicates that when the coordinates are entered into Google Maps, the location appears to be "246 Meadows Road." Doc. 637 at 8. Bussey states the relevant tax assessor's office has no physical address for "246 Meadows Road." Id. However, at the hearing, Bussey's counsel stated that the coordinates point to 224 Meadow Road. Doc. 1133 at 27. Thus, Bussey's position is a little unclear. He may be arguing that the geographic coordinates point to "246 Meadows Road," which is 0.3 miles from 224 Meadow Road, but he acknowledges that "246 Meadows Road" is not a valid address. On the other hand, based on the statements at the hearing, he may agree that the geographic coordinates point to 224 Meadow Road, which all agree is a valid address. Although there is some ambiguity in Bussey's position, he clearly argues that any inaccuracy in the worksite location was due to some error in converting the geographic coordinates to a street address and—importantly—he is not responsible for that error.

November 14, 2018 letter, indicating that Burnam dealt only with the employer, and not with Bussey, the agent in this scenario.[6]  Doc. 651 at 7–8 (referring to ¶¶ 41–45 of Agent Miranda's Affidavit).  Bussey notes the letter "was signed by N.A., the employer, and was directed to N.A."  Doc. 651 at 8, n.4.

Bussey also contends the affidavit should have included important facts about investigators' contacts with Cory Burnam.  Doc. 637 at 9–10 (referring to ¶¶ 41–45 of Agent Miranda's Affidavit).  Specifically, Burnam told investigators he used the labor contractor listed as the employer on the January 28, 2019 ETA 9142, but Burnam did not describe any communications with Bussey.  Id. at 10.  The affidavit does not include these facts.

### 4. *The Notice of Deficiency*

Bussey argues the affidavit omits important information related to Agent Miranda's statement that Bussey has had at least three fraudulent petitions and 833 refused visas.  Bussey argues the affidavit omits important information concerning the Notice of Deficiency process.  Doc. 637 at 10 (referring to ¶ 41–45 of Agent Miranda's affidavit).  Bussey notes that federal regulations provide for refusal of incomplete or obviously inaccurate petitions and for a deficiency response process.[7]  Doc. 637 at 10.

On February 4, 2019, a Notice of Deficiency ("NOD") was sent to Bussey, explaining the ETA 9142 was deficient.  Specifically, the application "failed to provide proper documentation on the transportation of workers, failed to provide an original surety bond, and failed to provide a current hotel inspection where the workers would stay."  Id. at 4.  Bussey responded to the email

---

[6]      Bussey does not specify in the briefing what contents from the letter should have been included to show that Burnam worked exclusively with the employer.

[7]      See 20 C.F.R. § 655.141 (detailing timeline and content of a Notice of Deficiency and explaining that an unremedied NOD will lead to denial of the application).

using the same email address on February 8, 2019, and "attached the response to the deficiency." Doc. 651-1 ¶ 44. Because an NOD is not "a marker of criminal activity" and "the regulations require its issuance and a chance to remedy," Bussey claims the affidavit misrepresents the importance of prior refused visas and of the NOD. Doc. 637 at 13 (referring to ¶ 44 of Agent Miranda's affidavit). As with the ETA 9142 itself, Bussey also notes any responsibility for the NOD should rest with the employer. Id.

### B.    The CS's Criminal History

Bussey acknowledges that the affidavit provided some information about the CS's criminal history, but Bussey argues the affidavit should have included more detail.

The affidavit provides the following statement about the CS's criminal history:

> The CS has criminal convictions for sexual assault in Texas in 1999, fugitive from justice for failing to register as a sex offender in Texas in 2006, possession of a firearm by a convicted felon in Georgia in 2007, and DUI and impersonating a public official in New York in 2013.

Doc. 885 at 12 (quoting Doc. 651-1). Bussey argues the affidavit should have included more details about the sexual assault conviction and the firearm conviction.[8] Doc. 651 at 11–12 (referring to ¶ 14 of Agent Miranda's Affidavit). The CS also pleaded nolo contendere for sexual assault in 2000, which is not mentioned in Agent Miranda's affidavit. Id. It appears from the briefing that the 2000 nolo plea arose from a different incident from the 1999 conviction.

### C.    Meetings and Calls Between Bussey and the CS

Bussey argues that the affidavit failed to include important information related to his contacts and communications with the CS. Specifically, Bussey argues the affidavit should have

---

[8]    Bussey incorporates all arguments concerning the CS into another motion to suppress. See Doc. 694 at 14. These arguments are identical. Even so, I have given careful, individualized consideration to each motion.

included more information about two meetings he had with the CS (one in April 2019 and one in August 2019) and one call with the CS in September 2019.

### 1.    *The April 30, 2019 meeting.*

Bussey met with the CS on April 30, 2019.  Doc. 651 at 12–15 (referring to ¶ 122 of Agent Miranda's affidavit).  This meeting was recorded on surveillance equipment, but the meeting was only briefly mentioned in the affidavit.[9]  Bussey argues Agent Miranda's affidavit should have described the April 30, 2019 meeting in more detail because the meeting is material to the determination of probable cause.

Bussey contends that during the April 30, 2019 meeting, he explained to the CS how he (Bussey) legally arranged for foreign worker visas.  However, the CS drove the conversation in the direction of bribes and unlawful activity, asking for opportunities to get into the business.  Bussey explained how the CS could legally operate a hotel to house workers, but declined to hastily help CS get into business "because the process takes time and requires all I's dotted and all T's crossed for the paperwork to get accepted."  Doc. 651 at 14 (referring to Doc. 651-11 at 12:38–16:04).  Bussey told the CS that "charging workers is illegal, he (Bussey) has never charged workers, no one can enslave workers, and he wants to go to Mexico to facilitate getting workers into the country legitimately."  Id. (referring to Doc. 651-11 at 19:40–19:48, 21:18–21:19, 22:46–22:50, and 27:00–27:15, respectively).  Generally, Bussey argues that these statements he made to the CS show that he was trying to encourage the CS to act lawfully, which undermines the affidavit's conclusion that Bussey was part of an unlawful scheme.

---

[9]    Bussey produced a recording of the April 30, 2019 meeting as Exhibit 6 to this Motion.  All citations to the meeting will reference that recording.

Bussey also told the CS that Inez Strickland may refer clients to Bussey because Strickland was "quitting the business."  Id. at 13 (referring to Doc. 651-11 at 6:16–6:54).  Bussey argues this omitted statement contradicts the affidavit's conclusion that Strickland was Bussey's business partner.  Id.

Bussey also argues the affidavit omits material facts about the consumption of alcohol during the April 30, 2019 meeting.  The CS provided alcohol to Bussey during the meeting and encouraged Bussey to drink.  Id. at 13–14 (referring to Doc. 651-11 at 3:41–3:43, 6:04–6:06, 19:26–19:28, 49:39–49:41, 1:03:38–1:03:45, 1:07:44–1:07:47, 1:14:29–1:14:31, 1:38:30–1:38:38).  After Bussey left the meeting, an agent monitoring the meeting told the CS, "You can't get him drunk" to which the CS replied that Bussey is an alcoholic.  Id. at 13–14 (referring to Doc. 651-11 at 1:45:48–1:45:59).  Bussey ostensibly argues that this fact undermines the importance or credibility of the statements he made to the CS.

### 2.    *The August 20, 2019 meeting.*[10]

Bussey and the CS met again on August 20, 2019.  Bussey acknowledges Agent Miranda's affidavit discusses this meeting, but Bussey contends the affidavit omits and misrepresents several important details about the meeting.  Id. at 15–17 (referring to ¶¶ 126–27 of Agent Miranda's affidavit).  Bussey explains that it does not appear that any alcohol was consumed at the August 20, 2019 meeting.[11]  Id.

---

[10]    Bussey produced an audio recording of the August 20, 2019 meeting as Exhibit 10 to this Motion.  All citations to the meeting will reference that recording.

[11]    Bussey's Motion is vague on this point.  He says, "There are no 'Cheers,' mentions of [s]cotch, or invitations to continue drinking at the August 20, 2019, meeting, which lasted about 75 minutes."  Doc. 651 at 15.  It appears that Bussey is pointing out that he was not plied with alcohol during the meeting, which would, presumably, make his statements during that meeting more reliable than his statements at the April 30, 2019 meeting.

Bussey notes the affidavit states he used TT1 to "arrange for" the August 20, 2019 meeting.  Id. at 8 (referring to ¶ 124 of Agent Miranda's affidavit).  Bussey disputes this characterization.  Bussey states the "CS repeatedly reached out to Bussey . . . to arrange the August 20, 2019 meeting."  Id.

The affidavit states Bussey "would deal with [Jorge Gomez]," an alleged conspirator and target of the investigation.  Id. at 15–16 (referring to ¶ 126 of Agent Miranda's affidavit).  But Bussey states that he told the CS he would not deal with Gomez during the August 20, 2019 meeting.  Id. at 15–16 (referring to Doc. 651-15 at 41:50–41:54).

The affidavit states Bussey claimed to know a "big head honcho guy" in Mexico.  Id. at 16 (referring to ¶ 126 of Agent Miranda's affidavit).  Bussey states that he told the CS during the meeting that he had not met any recruiter in Mexico.  Id. (referring to Doc. 651-15 at 45:30).

The affidavit states workers paid Bussey for entering the United States.  Id. (referring to ¶ 127 of Agent Miranda's affidavit).  Bussey states that he told the CS during the meeting that workers paid their crew leaders.  Id. (referring to Doc. 651-15 at 49:03).

Bussey acknowledges that he talked with the CS about other targets' involvement in furtherance of the illegal scheme—which is reflected in the affidavit—but he maintains he did not admit that he (Bussey) engaged criminal conduct.  Instead, Bussey contends he merely described to the CS what he thinks other people were doing and that their conduct was not legal.  Id. at 17.  Bussey argues the affidavit should have included all these facts.

### 3.    *The September 30, 2019 call.*

Bussey acknowledges that he had a telephone call with the CS on September 30, 2019, and that call is described in the affidavit, but he argues the affidavit misrepresents and omits details about the call.  Id. at 17–19 (referring to ¶¶ 128–29 of Agent Miranda's affidavit).

During the call, Bussey described his September 10, 2019 visit to the United States Consulate in Monterrey, Mexico. In the affidavit, Agent Miranda concludes that Bussey went to Mexico to "to push his fraudulent H-2A petitions through . . . ." Doc. 651-1 ¶ 129(a). Bussey argues nothing in the call supports Agent Miranda's conclusion and other evidence negates Miranda's conclusion. Doc. 651 at 17–18. Bussey asserts the call properly illustrates a legitimate visit to Mexico to support legal business activity. In support, Bussey cites an official memorandum created by a State Department agent memorializing the meeting with Bussey in Mexico. Doc. 651-16. Bussey contends he told the State Department agent that "charging workers fees was illegal and that he has never been part of such a process." Id. at 18.

Bussey also argues the affidavit omits important contextual details from the call. Late in the call, agents direct the CS to discuss with Bussey "how the CS can illegally use his hotel to further Bussey's role in the TCO scheme." Doc. 651-1 ¶ 128. Bussey contends he seemed "unclear" on the call "about what the CS means when the CS brings up the subject of what to charge" but the affidavit fails to mention his uncertainty. Doc. 651 at 18–19.

Bussey also contends the affidavit mischaracterizes his recommendations to the CS on how to "build out bunk beds in the space in front of his hotel." Doc. 651-1 ¶ 129(c). Bussey states this exchange only occurred "because Bussey had told the CS that his inn was on a consulate watch list because of the number of lease letters the CS had written." Doc. 651 at 19 (referring to ¶ 129(c) of Agent Miranda's affidavit). Bussey notes to the contrary that he recommended the CS run his business in a legitimate and legal way. Id. at 18–19.

Finally, Bussey contends the affidavit fails to explain that the CS met with Bussey the day after the call (on October 1, 2019) and "again got Bussey drunk." Id. at 19.

II.    **Franks** Analysis

I consider the second Franks element first, namely whether the affidavit would still support probable cause when corrected to address the alleged misrepresentations and omissions. As noted above, the Court must determine if Agent Miranda's affidavit established probable cause to believe: an individual is committing or has committed a qualifying offense; particular communications concerning that offense will be obtained through interception; and TT1 (the phone used by Bussey) was being used in connection with the offense or was leased to, listed in the name of, or commonly used by the individual committing the offense.

A.    **The Affidavit's Unchallenged Portions Establish Probable Cause**

I begin with a summary of the unchallenged portions of the affidavit. In the affidavit, Agent Miranda stated there was probable cause to believe Bussey committed several target offenses, including wire fraud, forced labor, labor trafficking, and conspiracy. The affidavit extensively describes Bussey's contacts with the other target subjects, his detailed knowledge of the target offenses, and his own demonstrated involvement in the H-2A visa application process.

Regarding Bussey's involvement in fraudulent petitions, it is undisputed that he submitted three petitions that investigators flagged as potentially containing fraudulent information and DOS has refused 833 visas associated with his petitions because of inaccurate or incomplete information. Doc. 651-1 ¶ 42.

The affidavit links Bussey to other target subjects (i.e., other members of the TCO) through phone records associated with TT1 in the following ways:

1.    TT1 was used to make 90 calls and 770 text messages to or from a phone associated with Inez Jo Strickland between January 1, 2019 and October 8, 2019. Id. ¶ 131(a). Inez Strickland used the same phone to file H2A petitions. Id. ¶ 131(b).

2.    TT1 was used to exchange 35 calls and 188 texts with Ismael Perez as recently as June 2019. Id. ¶ 131(d). Wal-Mart disclosed that Ismael

Perez's sister completed approximately 14 transactions receiving over $13,000 between August 8, 2018 and March 21, 2019. Further, Ismael Perez used the same phone to file H2A petitions. <u>Id.</u> ¶ 131(f). Perez is also associated with companies that filed fraudulent H2A petitions. <u>Id.</u> ¶ 131(g).

3.  TT1 was used to exchange 190 calls and 10 text messages with Donna Rojas as recently as October 2, 2019. <u>Id.</u> ¶ 131(i). TT1 also exchanged 59 calls with another phone used by Donna Rojas as recently as October 1, 2019. <u>Id.</u> ¶ 131(j). On August 9, 2019, Bussey submitted an ETA 9142 on her behalf. <u>Id.</u> ¶ 131(o).

4.  TT1 was used in 34 calls with a phone used by Jesus Alvarez as recently as September 4, 2019, and Alvarez used that phone to file H-2A petitions. <u>Id.</u> ¶ 131(p), (q).

5.  TT1 was used in 30 calls with a phone used by JC Castro as recently as April 10, 2019. Castro is an alleged member of the TCO. <u>Id.</u> ¶ 131(r)–(u).

6.  TT1 was used in 17 calls with a phone used by target subject Leticia Perez-Quintino as recently as July 25, 2019. <u>Id.</u> ¶ 131(v).

7.  TT1 was used in 6 calls with a phone used by target subject Twila Reyes as recently as August 16, 2019. <u>Id.</u> ¶ 131(x).

8.  TT1 was used to exchange 3 calls and 85 text messages with a phone used by Jorge Gomez as recently as October 6, 2019. <u>Id.</u> ¶ 131(z). Agent Miranda concluded that Gomez "unlawfully directs farm labor companies to use company agents operated by his family to file petitions for workers to enter the United States." <u>Id.</u> ¶ 131(bb).

Examining the affidavit as a whole—and based solely on the aspects that Bussey does not challenge as misrepresentations or omissions—probable cause exists for the wiretap order. "A wiretap application need not provide probable cause of criminal activity for each person named in an application . . . . What is required is sufficient information so that a judge could find probable cause to believe that the telephone in question is being used in an illegal operation." <u>Domme</u>, 753 F.2d at 954 n.2. The affidavit includes undisputed facts supporting probable cause that TT1 was used in an illegal operation. It is undisputed that TT1 was used on numerous occasions to correspond with other target subjects on whose behalf Bussey prepared multiple H-

2A petitions.  The affidavit also demonstrates the other target subjects committed target offenses. For example, Strickland completed multiple petitions associated with missing or misused workers.  Doc. 651-1 ¶¶ 46–50, 73–75.  Strickland also completed an ETA 9142 application with a housing agreement that investigators were later unable to verify.  Id. ¶¶ 48–50.  Further, a witness told investigators that Rojas illegally held worker passports and paid workers in cash without adequate statements or receipts.  Id. ¶¶ 58–65.  Bussey does not challenge the affidavit's allegations that Strickland, Rojas, and the other target subjects were involved in the target offenses and that Bussey had numerous contacts with those individuals.

Bearing in mind that "probable cause does not require overwhelmingly convincing evidence but only reasonably trustworthy information," probable cause exists that TT1 was used in furtherance of illegal activity when examining the unchallenged portions of the affidavit. Ortega, 85 F.3d at 1525.  A wiretap application must show probable cause for the belief that *an individual* is committing, has committed, or is about to commit" an enumerated offense and that "particular communications concerning that offense will be obtained through" interception." 18 U.S.C. § 2518(3)(a)–(b) (emphasis added).  This inquiry notably is targeted at TT1 itself and whether interception will reveal communications concerning an individual's commission of an enumerated offense.  That individual need not necessarily be Bussey.  Setting the challenged portions of the affidavit to one side, I conclude that the remaining unchallenged portions of the affidavit still support probable cause that (1) violations of qualifying offenses occurred, and (2) communications regarding those offenses will be found on TT1.

**B.    The Affidavit's Alleged Misrepresentations or Omissions Do Not Undermine Probable Cause**

Even if the Court accepted all of Bussey's challenges—correcting the alleged misrepresentations and including the omitted facts—the affidavit would still support probable

cause.  In other words, even when considering Bussey's challenges, the challenges would not

prevent a finding of probable cause.  Bussey makes several challenges to the affidavit.  To

summarize, Bussey argues for the following corrections:

1.     The affidavit should have described the different ETA 9142 certification standards for a signing employer and a signing agent.  The employer signs the application under penalty of perjury; the agent does not.  The employer is ultimately responsible for the accuracy of the information in the application.

2.     The affidavit should have described how the 224 Meadow Road location may have originated from geographic coordinates in the letter from Cory Burnam and how Burnam used the employer listed on the application.

3.     The affidavit should have mentioned that a Notice of Deficiency is standard practice under federal regulations.

4.     The affidavit should have included a detailed, accurate criminal history for the CS, including his 2000 nolo contendere plea for sexual assault.

5.     The affidavit should have included details about the April 30, 2019 meeting with the CS where Bussey explained how the CS could legally conduct business with labor contractors and where the CS served Bussey alcohol to the point of intoxication.

6.     The affidavit should have explained that Bussey did not admit to any criminal conduct during the August 20, 2019 meeting with the CS.

7.     The affidavit should have included more information about the September 30, 2019 call between Bussey and the CS and more information about Bussey's September 10, 2019 visit to the U.S. Consulate in Mexico, which would have undermined Miranda's conclusion that Bussey went to Mexico to "push his fraudulent H-2A petitions through" at the consulate.

As explained below, the affidavit would still support probable cause even if these

changes were made.  I address each challenge in turn.

### 1.     The ETA 9142 certification.

Bussey's contentions about misrepresentations and omissions tied to the January 28, 2019

ETA 9142 application do not undermine probable cause.  Bussey is correct that the affidavit

inaccurately describes the ETA 9142's penalty of perjury clause.  The employer's certification is

made subject to penalty of perjury, while the agent's certification is not.  Thus, Bussey has identified a misrepresentation.  However, even if the affidavit were corrected to state that the employer signs a certification under penalty of perjury and the agent does not, this would still not undermine probable cause.

Although the agent does not sign the ETA 9142 application under penalty of perjury, the agent expressly certifies that "to the best of [his]  knowledge the information contained [in the ETA 9142 application] is true and correct."  This means Bussey affirmatively certified to the United States Department of Labor that all the information contained in the January 28, 2019 ETA 9142 was "true and correct" to the "best of [his] knowledge."  Bussey suggests that he bears *no* responsibility for the truth of the information in the application because the employer takes "full responsibility" for the accuracy of information and certifies under penalty of perjury. Bussey's argument is unconvincing.  The threat of perjury penalties certainly highlights the importance of the certification for the employer, but it does not diminish or eliminate the agent's role.  The agent affirmatively certifies that the information contained in the application, without limitation, is true and correct to the best of his knowledge.  That certification is meaningful.

Bussey also underplays the rest of the agent's certification.  An agent affirmatively certifies that knowingly furnishing false information "is a felony punishable by a $250,000 fine or 5 years in a federal penitentiary or both (18 U.S.C. 1001)."  Doc. 637-2 at 32.  If an agent furnishes false information in an ETA 9142, he may not have committed perjury, but he would have committed a felony.[12]  The affidavit—if corrected—would still show that Bussey certified the information in the January 28, 2019 ETA 9142 application was true and correct, and it would

---

[12]    It would also be incorrect to say that agents are never subject to a perjury conviction for making false statements.  Bussey concedes that Form I-129 does require the agent to sign a penalty of perjury clause.  Doc. 637 at 7 n.5 (referring to Doc. 637-2 at 9).

provide factual statements showing that some of the information in that application was incorrect. It would also demonstrate that while only an employer certifies an ETA 9142 under penalty of perjury, an agent could still bear serious criminal consequences for lying on the form. Thus, even if corrected, this portion would support a finding or probable cause.

### 2. *The 224 Meadow Road location.*

Bussey raises four challenges related to the 224 Meadow Road worksite identified in the affidavit. First, Bussey argues the affidavit fails to explain that 224 Meadow Road was only 1 of 9 worksites listed on grower Cory Burnam's letter and 1 of 21 worksites listed on the ETA 9142 itself. Doc. 637 at 8. Second, Bussey asserts GPS coordinates in the letter correspond to a location 0.3 miles away from 224 Meadow Road, and the affidavit does not acknowledge this. Doc. 651 at 7–8 n.4. Third, Bussey claims the affidavit omits content from the letter showing that it was signed by the employer, not Bussey. Id. at 7–8. Finally, Bussey argues that the affidavit fails to disclose email and phone communications between agents and Cory Burnam, in which Burnam only described dealings with the employer, and not Bussey. Id.

### (a) *Failure to describe other worksites.*

If the affidavit had mentioned that the ETA 9142 listed 21 worksites and Burnam's letter listed 9—as Bussey contends it should have—probable cause would not be materially affected. Bussey's argument here appears to be as follows: If agents visited the other locations listed on the documents and there were no problems at sites, it would demonstrate that any problem with 224 Meadow Road was likely an innocent mistake.[13] But Agent Miranda's affidavit makes no

---

[13] Bussey does not clearly explain why the other worksite information would have impacted probable cause. But he does question whether investigators visited the other worksites, and he suggests that the sheer number of other worksites would have diminished the importance of 224 Meadow Road. At the hearing, for instance, counsel for Bussey stated, "[I]t is just sort of shocking to me that you've got

claim about any other sites.  The alleged problems with the 224 Meadow Road site would still exist even if there were no problems with any other site.  At most, inclusion of these new facts would show the ETA 9142 was for a number of sites, at least one of which was suspicious to investigators.  While investigation of those locations might (or might not) reveal that some sites were legitimate, the mere fact that other sites existed is inconsequential.

In addition, the 224 Meadow Road worksite would not lose significance just because it was one of several worksites listed on the ETA 9142.  Investigators uncovered facts about the 224 Meadow Road worksite that were similar to the problems with other applications submitted by other members of the alleged TCO.  For example, investigators interviewed a grower identified in a January 29, 2019 application that Maria Patricio submitted.  The grower stated he did not request contract workers.  Doc. 651-1 ¶¶ 84–86.  Investigators interviewed the owner of a housing property identified in a March 19, 2018 application Maria Patricio submitted.  The property owner stated his property was never used to house workers.  Id. ¶¶ 88–90.  The affidavit describes several other similarly deficient applications that target subjects and their associates submitted.  Id. ¶¶ 48–50, 79–81, 93–111, 119–121.  Investigators had an almost identical experience when investigating 224 Meadow Road.  Even if the affidavit explained that 224 Meadow Road was one of many worksites, it would not diminish the importance of the undisputed facts related to the investigation of that worksite location.

> (b)    *The discrepancy between the GPS coordinates and address for 224 Meadow Road in Burnam's letter.*

Bussey claims the affidavit should have described the discrepancy between the GPS coordinates in Cory Burnam's letter and the corresponding address in the ETA 9142 because it

---

nine addresses and they're relying on one . . . that . . . the GPS coordinates are different from the physical address."  Doc. 1133 at 33.

would have demonstrated there was a mistake. This argument is unconvincing. First, Bussey has not shown that the discrepancy was a mistake. Bussey claims the GPS coordinates on Cory Burnam's letter did not line up precisely with 224 Meadow Road, but he does not dispute that the physical 224 Meadow Road address was present on both Burnam's letter and Bussey's ETA 9142. The ETA 9142 listed 224 Meadow Road as a worksite, as did the letter. Even if the coordinates lead to a non-existent address 0.3 miles from the 224 Meadow Road address, this does not create an issue with the affidavit. There is no evidence that GPS coordinates that almost line up with the closest listed street address represent a mistake. Furthermore, Bussey has provided no reason to believe there is an alternative legitimate address that would have corrected the mistake.

Even assuming there was a mistake on the ETA 9142 or on the letter, Bussey fails to show that including information about the supposed mistake in the affidavit would have undermined probable cause. At most, the affidavit would have stated something akin to: "The GPS coordinates provided by Burnham do not appear to correspond direct to 224 Meadow Road." But even with that addition, the ETA 9142 would still have requested workers for a nonexistent worksite. The application would still identify 224 Meadow Road as a worksite address. The owner of 224 Meadow Road still would not have requested any laborers. Indeed, if the GPS coordinates were inconsistent with the street address, that inconsistency would made the application more suspicious, not less. The burden under Franks is on the defendant to demonstrate an alleged omission would have prevented a finding of probable cause. United States v. Lebowitz, 676 F.3d 1000, 1010 (11th Cir. 2012) (citation omitted). Bussey has failed to

meet that burden with respect to the discrepancy between the GPS coordinates and the 224 Meadow Road worksite address.[14]

          (c)      *Failure to describe Burnam's letter and investigators' contacts with Burnam.*

Bussey argues that the affidavit should have described a letter that was attached to the January 28, 2019 ETA 9142 application and should have described investigators' contacts with Burnam. As explained below, these facts, even if they had been included in the affidavit, would not negate probable cause.

The January 28, 2019 ETA 9142 application was supported by a letter that identified various worksites. Doc. 637-4. The letter purports to be a "fully executed work contract agreement" between the grower, Cory Burnam, and the employer (identified by the initials "N.A."). Id. The letter is signed by Burnam and N.A. The letter identifies 9 worksite locations by GPS coordinates and by street addresses. The first worksite is 224 Meadow Road. The letter was mentioned in Agent Miranda's affidavit, but it was not described in detail. Doc. 651-1 ¶ 43.

Bussey fails to explain why the letter should have been described in more detail or why more detail would have undermined probable cause. Doc. 651 at 7–8; Doc. 637 at 8. Ostensibly, Bussey argues that the letter would have shown that he (Bussey) relied exclusively on information provided by the grower and the employer when identifying worksite.[15] If this is

---

[14]     Additionally, alternative, innocent explanations for conduct do not negate probable cause. See United States v. Welch, Case No. CR410-159, 2011 WL 3911113, at *4 n.7 (S.D. Ga. Aug. 18, 2011) ("[A] probable cause assessment deals in *probabilities*, not certainties, and there is no requirement that a probable cause finding rule out all such innocent explanations") (emphasis in original) (first citing Illinois v. Gates, 462 U.S. 213, 238 (1983); then citing United States v. $24,484.00 in U.S. Currency, 389 F.3d 1149, 1160 (11th Cir. 2004)).

[15]     It may be that Bussey believes the letter bolsters his point about the discrepancy in the 224 Meadow Road address and the GPS coordinates. See Doc. 936 at 9. It does not. The letter itself does not suggest any "mistake" or who was responsible for such a "mistake." It is merely a list of coordinates and addresses.

Bussey's intended argument, it is unconvincing.  The letter is a 2-page, primarily handwritten document that includes a list of worksites and the grower and employer's names and signatures. This information is entirely consistent with the body of the ETA 9142 application that Bussey submitted, that led investigators to 224 Meadow Road, and that, ultimately, supported probable cause to believe Bussey was participating in the TCO.  Additional facts about this letter would not have undermined probable cause in any way.

As to investigators' contacts with Burnam, Bussey points to an investigator's case notes that show that Burnam described his interactions with N.A. (the employer), but Burnam did not mention any contact with Bussey.  See Doc. 637-3.  According to Bussey, these notes show "that all of [Burnam's] discussions had been with the employer, not Mr. Bussey."  Doc. 637 at 12–13. Bussey makes far too much of the investigator's case notes.  The notes do not show that Burnam did not meet with or talk with Bussey.  Nor do the notes show that "all" of Burnam's conversations had been with the employer.  Rather, the notes describe Burnam's account of a few communications between Burnam and the employer and nothing more.  Bussey fails to show that a description of the investigator's contacts with Burnam in the affidavit would have impacted probable cause in any way.

Ultimately, Bussey has not made a substantial showing that any omissions or misrepresentations related to the ETA 9142 itself were necessary to a finding of probable cause.

### 3.      The NOD.

Bussey argues the affidavit should have explained that federal regulations establish the NOD process and NODs are "standard practice."  Doc. 637 at 10.  Bussey's argument appears to be that, although several hundreds of visas associated with his petitions have been denied, there is no probable cause because the regulations contemplate a deficiency and cure process.  He

makes the same argument regarding the NOD.  Because the regulations expressly provide for an NOD process, Bussey claims there is "nothing unusual" about these facts.  Doc. 637 at 10–11.

Bussey's argument is unconvincing for several reasons.  First, Bussey has not identified an omission of fact for the Court to consider.  Instead, he contends the affidavit should have explained that an NOD is "standard practice."  Bussey is merely arguing that the affidavit should have included a favorable characterization of the NOD process.  Bussey cites no authority suggesting that an applicant for a wiretap is required to provide favorable characterizations of a regulatory scheme.  Additionally, Bussey has not shown that NODs are "standard practice." Bussey states the regulations provide for the NOD process, but he fails to offer any information about how those regulations are actually applied.

In addition, Bussey does not explain how this "omission" impacts probable cause.  Agent Miranda states in the affidavit that Bussey has filed three fraudulent petitions and the Department of State has refused 833 visas associated with Bussey's petitions.  Doc. 651-1 ¶ 42.  Agent Miranda also states the NPC emailed Bussey an NOD, and Bussey responded with corrections to the January 28, 2019 ETA 9142.  Id. ¶ 44.  These are all undisputed facts that show a pattern of defects in Bussey's petitions strikingly similar to defects in other target subjects' petitions. These undisputed facts would remain in the affidavit even if the Court made Bussey's requested changes.

Bussey's argument also conflates direct personal criminality with probable cause. "Innocent behavior frequently will provide the basis for a showing of probable cause" because such a showing only requires "a probability or substantial chance of criminal activity, not an actual showing of such activity."  Gates v. Khokhar, 884 F.3d 1290, 1298 (11th Cir. 2018) (quoting Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983)).  Indeed, alternative, innocent

explanations for conduct do not negate probable cause. See United States v. Welch, Case No. CR410-159, 2011 WL 3911113, at *4 n.7 (S.D. Ga. Aug. 18, 2011) ("[A] probable cause assessment deals in *probabilities*, not certainties, and there is no requirement that a probable cause finding rule out all such innocent explanations") (emphasis in original) (first citing Illinois v. Gates, 462 U.S. 213, 238 (1983); then citing United States v. $24,484.00 in U.S. Currency, 389 F.3d 1149, 1160 (11th Cir. 2004)).  While defects in ETA 9142 applications may not be inherently criminal, the defects may still support a finding of probable cause to believe a target is engaged in criminal conduct.  Facts about Bussey's deficient applications support probable cause regardless of whether those deficiencies were remedied through the NOD process.  The Court's probable cause determination would not change if it corrected the affidavit to include information about the federal regulations and the NOD process.

### 4.  *The CS's criminal history.*

Bussey argues the affidavit should have explained that the CS entered a nolo contendere plea for sexual assault in 2000 and should have provided details about that conviction.[16] Doc. 651 at 12.  Bussey also asserts the affidavit should have provided more information about the CS's prior gun conviction.  Id.  Bussey does not explain why he believes these omissions are material.

The omissions Bussey identifies do not undermine probable cause for two reasons.  First, the affidavit did provide an extensive criminal history for the CS, if not a complete one.  The affidavit made the issuing judge aware of the fact the CS had prior sexual assault convictions from the same time period as the omitted nolo plea, and the affidavit informed the judge about

---

[16]    Bussey provides information regarding the CS's 2000 sexual assault convictions under seal.  I will not elaborate on the contents at this time.  Docs. 651-12, 651-13, 651-14.

the gun conviction.  The issuing judge, therefore, had a substantial amount of information about the CS's criminal history.  Bussey makes no attempt to explain how additional information would undermine that determination.

Second, even assuming the additional criminal history would erode CS's credibility some, the factual allegations in the affidavit did not depend on the CS's credibility.  The affidavit relies largely on two recorded conversations between the CS and Bussey.  The facts about what occurred during these calls are undisputed.  The affidavit also describes one unrecorded, unmonitored call between the two on August 19, 2019.  But that call is only used to show how the CS contacted Bussey on TT1 to set up the August 20, 2019 meeting.  It is undisputed that the CS contacted Bussey on TT1 on August 19, 2019.  Thus, nothing in the affidavit was based on the CS's credibility.  See, e.g. United States v. Haimowitz, 706 F.2d 1549, 1555–56 (11th Cir. 1983) (finding that omissions about criminal history do not always negate probable cause, especially if the informant's statements are independently corroborated).  Consequently, more information about the CS's criminal history would not have undermined the probable cause determination.

### 5.    *The April 30, 2019 meeting with the CS.*

Bussey argues the affidavit should have described his meeting with the CS on April 30, 2019.[17]  Doc. 651 at 12.  More specifically, Bussey contends the affidavit should have included the following facts about the meeting: (1) Bussey told the CS during the meeting how to legally

---

[17]    Bussey states the affidavit says "nothing about" the April 30, 2019 meeting.  This is not quite accurate.  The affidavit states that law enforcement "had previously directed the CS to contact Bussey with the agents to discuss the TCO illegal scheme and how the CS could profit from the TCO illegal scheme."  Doc. 651-1 ¶ 122.  This appears to be a reference to the April 30, 2019 meeting.  Even so, it is true that the affidavit says almost nothing about the April 30, 2019 meeting.

work with the H-2A program; and (2) the CS, knowing Bussey was an alcoholic, served a large amount of alcohol to Bussey at the meeting.  Doc. 651 at 12–15.

The details about Bussey's April 30, 2019 meeting with the CS—even if they had been included in the affidavit—would not have undermined a probable cause finding.  Bussey argues the affidavit should have explained that he (Bussey) told the CS during the April 30, 2019 meeting how to legally conduct business related to contract laborers.  But even if that fact were included, it would not diminish other incriminating statements Bussey made during that meeting and a later August 20, 2019 meeting (which are described in the affidavit).  Indeed, at both meetings, Bussey demonstrated extensive knowledge about the TCO and its criminal activities, explained that he had close ties to several targets of the investigation, and discussed his direct involvement in H-2A visa applications.  These details are enough to support probable cause to believe Bussey used TT1 to commit the target offenses, including wire fraud, forced labor, labor trafficking, visa fraud, and conspiracy.  Importantly, even if Bussey advised the CS on how to proceed with a legal business at the April 30, 2019 meeting, his other statements show that he, personally, was likely participating in the criminal scheme.

Bussey also argues the affidavit should have explained that the CS served alcohol to Bussey during the April 30, 2019 meeting and that Bussey became very intoxicated.  Doc. 651 at 9.  Bussey's allegations concerning the CS plying him with alcohol—which the Government does not dispute—are troubling.  Bussey has shown that the CS brought alcohol to the meeting, possibly with agents' knowledge and permission, and repeatedly encouraged Bussey to drink.  Doc. 651 at 13; Doc. 1133 at 98–99.  Agents eventually had to admonish the CS for giving Bussey alcohol when the CS knew that Bussey had driven to the meeting.  Doc. 651 at 13–14.  Agents were also aware that Bussey "had a drinking problem."  Doc. 1133 at 156.

While the details surrounding alcohol consumption at the April 30, 2019 meeting raise serious concerns about the judgment of both the CS and agents, they do not undermine a finding of probable cause. In his Motion, Bussey does not clearly explain how alcohol consumption at the meeting would impact the probable cause determination. Bussey does not suggest, for example, that he said things that were untrue or exaggerated because he was intoxicated. Instead, Bussey merely argues that the CS's use of alcohol during the investigation was improper.[18] Regardless of the nature of Bussey's specific challenge, it fails. The affidavit does not rely on any of Bussey's statements made during the April 30, 2019 meeting, so none of Bussey's statements during that meeting were used to support a finding of probable cause.[19]

Ultimately, Bussey has not made a substantial showing that alcohol consumption materially impacted the content or reliability of his statements or that the details of the meeting were essential to a finding of probable cause. To be sure, this conclusion should not be read as an endorsement of the CS's use of alcohol during the April 30, 2019 meeting, with the potential acquiescence by law enforcement. The circumstances of that meeting are troubling and, if the facts of this case were somewhat different, the use of alcohol may have had a significant impact on the issue of probable cause.

### 6.    The August 20, 2019 meeting with the CS.

Defendant Bussey makes several challenges to the affidavit's description of the August 20, 2019 meeting. I address each of Bussey's challenges.

---

[18]    It may be that Bussey relies on the CS's use of alcohol to demonstrate that the investigators acted intentionally or recklessly. As explained elsewhere, I do not need to reach that issue because I have determined that the affidavit would still support probable cause even if the affidavit were corrected to address all of Bussey's challenges.

[19]    Regarding the April 30, 2019 meeting, the affidavit merely states the CS had previously contacted Bussey "to discuss the TCO illegal scheme and how the CS could profit from" it. Doc. 651-1 at ¶ 122.

First, Bussey challenges the affidavit's description of the conversation between Bussey and the CS about Jorge Gomez. The affidavit states: "Bussey explained Bussey would deal with Gomez," but Bussey contends now that he said during the meeting that he (Bussey) would not deal with Gomez. Doc. 651 at 15–16 (referring to ¶ 126(a) of Agent Miranda's affidavit; Doc. 651-15 at 41:50–41:54). At the meeting, the CS asked Bussey whether he (the CS) should work with Gomez. Bussey responded, "I wouldn't deal with him." Doc. 651-15 at 41:50. Later in the meeting, Bussey said the following about Gomez, "He's just, I don't know. I don't really like him. I've worked with him. He's crooked." Id. at 42:06-42:10. Based on these conversations, it is clear that Bussey said he had worked with Gomez in the past, but Bussey was advising the CS not to work with Gomez. Bussey does identify a small discrepancy between the conversation and the description of the conversation in the affidavit, but Bussey far overstates the significance of that discrepancy. The affidavit states that Bussey "would deal" with Gomez, and Bussey did, in fact, state during the meeting that he had worked with Gomez in the past. Bussey did caution the CS about working with Gomez, but Bussey never stated that he (Bussey) would not work with Gomez in the future. Bussey's statement "I wouldn't deal with [Gomez]," clearly carries with it the implied statement ". . . if I were you." Bussey has not shown that there is any misrepresentation in the affidavit. To the extent the affidavit omits Bussey's cautionary statement to the CS, the omission is not material, particularly given that the affidavit explains that Bussey did not like Gomez and believed Gomez to be "crooked." Thus, Bussey has not identified any material omission or misrepresentation related to the conversation about Gomez that would have impacted probable cause.

Next, Bussey challenges the affidavit's description of statements that Bussey made during the meeting about a "big head honcho guy." The affidavit states Bussey knows a "big

head honcho guy" in Mexico, but Bussey now contends that he said, "I haven't met him." Doc. 651 at 16 (referring to ¶ 126(b) of Agent Miranda's affidavit; Doc. 651-15 at 45:30). Again, Bussey's challenge is not baseless, but it far overstates the significance of any discrepancy.

During the meeting, Bussey states, "I've got some connections in Mexico . . . . If that's the case me and you can start making some money because I've got a connection down there. I'm actually going to Mexico in November . . . . I know a guy, a big head honcho guy down in Mexico." Doc. 651-15 at 42:59-43:15. Later in the conversation, Bussey states, "I don't know him very, very well yet. I've spoken to him but I haven't met him." Id. at 45:23. It is clear in the conversation that Bussey claims to "know" an individual he describes as a "big head honcho guy" and Bussey has spoken to the individual but has not met him in person. Agent Miranda's affidavit is accurate in that it states Bussey claims to "know" a "big head honcho guy" in Mexico. The affidavit fails to explain that Bussey has spoken to the individual but had not met him in person, but that omission is immaterial to probable cause. The additional facts would merely provide some context and detail to Bussey's claim of "knowing" the individual, but would not, in any discernible way, diminish Bussey's unequivocal statement that he knows the individual.

Bussey's next challenge concerns statements in the affidavit about foreign workers paying Bussey to enter the country. Doc. 651 at 16 (referring to ¶ 126(b) and (d) of Agent Miranda's affidavit; Doc. 651-15 at 49:03). The portion of the affidavit that Bussey challenges consists of two parts. First, the affidavit describes statements Bussey made to the CS, where Bussey describes a criminal scheme involving the "head honcho," including a description of payments made by workers. Doc. 651-1 ¶ 126(b). According to the affidavit, Bussey said the

"head honcho" would charge workers a fee and Bussey would receive some of that money. Second, Agent Miranda makes an inference based his training, experience, the entire investigation, and, specifically, Bussey's statements about the scheme involving the "head honcho." Id. Agent Miranda states, "I believe that Bussey was explaining that he has a recruiter in Mexico that finds workers for the H-2A visa program. These workers then pays [sic] Bussey for entering the United States under the H-2A visa program." Id.

Bussey argues that the affidavit misrepresents his conversation because he (Bussey) never said that workers paid Bussey. During the meeting, Bussey explained to the CS that the "head honcho" would recruit workers, then, according to Bussey, "[the head honcho] charges them . . . probably . . . a gigantic fee. We charge . . . . He gets the money from them. He pays us." Doc. 651-15 at 44:00. Bussey then says, "For 150 workers, I could be looking at making upwards to $100,000 in cash money." Id. at 44:12.

Like Bussey's other challenges to this portion of the affidavit, here, he identifies a minor discrepancy, but the discrepancy, even if corrected in the affidavit, would have no impact on probable cause. Bussey contends that an accurate description of the conversation would have explained that the "head honcho" in Mexico exploits workers and charges them an illegal fee and that Bussey would receive part of that fee from the "head honcho," but Bussey never said he would receive the fee directly from the workers. The distinction is insignificant as to probable cause. At most, it would show that Bussey was aware of how to obtain illegal payments indirectly from foreign workers, which would not undermine probable cause.

Bussey also challenges the statement in the affidavit that Donna Rojas uses her family members to complete H-2A paperwork. Doc. 651 at 16. (referring to ¶ 126(e) of Agent Miranda's affidavit). Bussey argues the affidavit should have explained that he (Bussey) is not

related to Donna Rojas.  Nothing in the portion of the affidavit that Bussey challenges, however, suggests that Bussey is related to Donna Rojas.  To the contrary, the challenged paragraph describes Bussey's statements that Rojas utilizes "her cousin," "her uncle," and her other family members.  A plain reading of this portion of the affidavit demonstrates that Bussey is describing Donna Rojas and her family's involvement and that Bussey is not part of Rojas's family.  Here, Bussey has not identified any misrepresentation.  At most, he has identified the omission of an insignificant fact that can be reasonably inferred from the affidavit.

Last, Bussey challenges a statement in the affidavit about H-2A petitions.  In this portion of the affidavit, Agent Miranda describes Bussey's remarks to the CS about the participants in H2-A visa schemes selling and trading workers and about workers absconding from worksite locations and obtaining false identification documents.  Doc. 651-1 ¶ 126(f).  Bussey does not dispute that the affidavit accurately describes his remarks to the CS, but Bussey argues that he was merely telling the CS "what other people do with respect to H-2A petitions" and explaining that those actions are "not legal."  Doc. 651 at 16–17 (referring to ¶ 126(f) of Agent Miranda's affidavit).  In other words, Bussey does not identify any misrepresentation or omission; instead, he contends that the affidavit should have explained that he was merely describing others' conduct to the CS.  Bussey merely suggests that the affidavit could have included a more favorable characterization of the evidence, but he fails to identify any material omission or misrepresentation.  Therefore, this portion of Bussey's challenge fails.[20]

---

[20]    Bussey makes one additional challenge, but it requires little discussion.  The affidavit states Bussey used TT1 "to arrange" a meeting with the CS.  Doc. 651-1 ¶ 124.  Bussey argues the statement is false because the CS is the one who initiated the meeting.  Doc. 651 at 8.  Bussey is simply quibbling about the use of the word "arrange," which has more than one meaning.  See arrange, Merriam-Webster (http://www. https://www.merriam-webster.com/dictionary/arrange) ("to make preparations for: plan"; "to bring about an agreement or understanding").  Bussey does not dispute he used TT1 to talk with the CS about meeting, meaning Bussey used TT1 to "make preparations for" the meeting."  Thus, Bussey has not shown that the use of the term "arrange" in the affidavit is a misrepresentation.

Even if the affidavit were "corrected" to address each of Bussey's challenges related to the August 20, 2019 meeting, probable cause would not be undermined or diminished in any way. Bussey's challenges fail to identify any material fact that would bear on the issue of probable cause. Furthermore, even accounting for Bussey's challenges, almost all of the factual statements in the affidavit about the August 20, 2019 meeting would remain undisputed.

### 7.    *The September 30, 2019 call.*

Bussey argues the affidavit makes omissions and misrepresentations about the call between him and the CS on September 30, 2019. During that call, the two discussed Bussey's trip to the consulate in Mexico. Bussey argues Agent Miranda's conclusion that Bussey "went to the consulate office in Mexico to meet with individuals to try to push his fraudulent H-2A petitions through without officials denying visas" is wrong. Doc. 651 at 17 (referring to ¶129(a) of Agent Miranda's affidavit). Bussey states, "[A] proper reading of what Bussey [said during the September 30, 2019 call] leads to the conclusion that Bussey tried to put a face with a name to improve the success of his petitions, which were legally submitted." Id. As support, Bussey points to a State Department official's memorandum of interview from the meeting, which says Bussey discussed only legal visa procedures and disavowed any illegal activity. Id. at 18. Bussey also states that he suggested only legal avenues for the CS to participate in the H-2A visa program, and he "seem[ed] unclear" when the CS asked about charging workers illegally. Id. at 18–19.

Bussey's contentions, even if true, do not identify any omission or misrepresentation that would negate probable cause. First, Bussey has not shown that a description of the Department of State memo would have any impact on probable cause. Bussey met with a consular officer, discussed the H-2A program, and did not admit to charging workers in that meeting. This does

not undermine the fact that Bussey went to Mexico to obtain visas for H-2A workers and it does not undermine any other aspect of the affidavit. Bussey, therefore, has not shown how including a description of the memorandum would impact probable cause.

Regarding the Mexico trip, Bussey does not appear to argue the affidavit misstated or omitted any specific factual detail. Bussey's primary challenge is to Agent Miranda's subjective belief about the purpose of the trip. Bussey argues Miranda's subjective belief was wrong and that a "proper reading" of Bussey's statements would lead to a different subjective belief. The statement Bussey that seems to take issue with reads: "Based on this entire investigation and my training and experience, I believe that Bussey used [TT1] to explain that he went to the consulate office in Mexico to meet with individuals to try to push his fraudulent H-2A petitions through without officials denying visas." Doc. 651-1 ¶ 129(a).

Bussey's challenge lacks merit. At this stage, the only relevant inquiry is whether the affidavit contains material omissions or misrepresentations. Agent Miranda is offering his subjective belief about the reasons for Bussey's trip. Agent Miranda's subjective belief is not demonstrably false. As such, while Bussey may disagree with Agent Miranda's conclusion, he has not pointed to any misrepresentation or omission. Furthermore, "[o]pinions and conclusions of an experienced agent regarding a set of facts are properly a factor in the probable cause equation." United States v. Robinson, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995) (citation and punctuation omitted).

Regarding the remainder of the September 30, 2019 call, Bussey argues the affidavit should have explained that he seemed "unclear about what the CS means when the CS brings up the subject of what to charge in letters." Doc. 651 at 18–19 (referring to ¶ 128 of Agent Miranda's affidavit). Bussey also argues that he advocated for steps to "allow the CS to fill his

rooms legally" when pressed by the CS about "how much to charge for documentation and whether [the CS] should charge for additional bed space." Id.  However, Agent Miranda's statement in the affidavit does not reflect anything said by Bussey during this conversation. Agent Miranda states, "Specifically, the CS contacted Bussey for direction on how much money the CS should charge for documentation indicating that his hotel would be used to house workers, and whether the CS should build additional bed space at his hotel for Bussey to use in the TCO illegal scheme."  Doc. 651-1 at 52.  Agent Miranda makes no representations about Bussey's statements or reactions during this interaction, and Bussey's statements had no bearing on the probable cause analysis.  Again, Bussey fails to identify an omission or misrepresentation that would impact probable cause.

Ultimately, Bussey has not made a substantial showing that the challenged statements and omissions were essential to the probable cause determination.  Even if the challenged statements in Agent Miranda's affidavit were corrected to address each of Bussey's particularized concerns, the affidavit would still support probable cause.  Therefore, his Motion to Suppress and his request for a Franks hearing should be denied.[21]

Even considering all of Bussey's challenges together, and how all the challenges combined would impact the facts contained in the affidavit, Agent Miranda's affidavit would still support a finding of probable cause.  To be clear, Defendant Bussey has made some valid

---

[21]    I conducted a provisional Franks hearing on this Motion.  Doc. 1133 at 77–195.  Kelly Linemann, an assistant special agent with the Department of Labor, provided testimony.  Id. at 78.  Though Agent Miranda signed the affidavit, Agent Linemann drafted much of the affidavit.  Id. at 82–85.  Agent Linemann also worked with the CS.  Id. at 90.

It is not necessary to consider the evidence taken during the provisional Franks hearing.  Bussey has not made a substantial showing that any challenged statement or omission was essential to probable cause.  Any testimony showing agents acted recklessly or deliberately would not change this determination.

challenges to inaccuracies within the affidavit. Bussey correctly points to issues with statements related to the agent certification standard, the omission of some of the CS's criminal history, and a few minor discrepancies in the affidavit's description of the August 20, 2019 meeting. Bussey also pointed to troubling aspects of the CS's use of alcohol. Even so, most of Bussey's challenges do not identify any material omissions or misrepresentations in the affidavit and, instead, merely ask for a better characterization of the evidence. Those challenges do not undermine probable cause. Furthermore, the undisputed aspects of the affidavit show that Bussey had intimate knowledge of the TCO and its scheme to conduct H-2A visa fraud, Bussey had extensive contacts with members of the TCO and individuals in Mexico, and Bussey articulated plans to engage in an H-2A visa scheme during recorded meetings with the CS. Thus, even considering all of Bussey's challenges together and in conjunction with all of the unchallenged statements, Bussey has not shown that Agent Miranda's affidavit fails to establish probable cause.

## III.    Necessity

Bussey argues Agent Miranda's affidavit failed to satisfy the "necessity" requirement of 18 U.S.C. § 2518(1)(c), which demands that each wiretap application reflect "other investigative procedures have been tried and failed or . . . reasonably appear unlikely to succeed if tried or to be too dangerous." Doc. 651 at 22. Bussey argues the "need for interception" section of the affidavit uses boilerplate language that insufficiently describes the need to wiretap his phone. Id. at 25. The Government argues the affidavit shows the wiretap was necessary to accomplish all the goals of the investigation. Doc. 885 at 14–18.

The burden of establishing necessity is "not great."  United States v. Acosta, 807 F. Supp. 2d 1154, 1239 (N.D. Ga. 2011) (quoting United States v. Gray, 410 F.3d 338, 343 (7th Cir. 2005)).

> The necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed . . . .  The affidavit need not, however, show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.

United States v. Van Horn, 789 F.2d 1492, 1495–96 (11th Cir. 1986).  The Government's showing of necessity "must be read in a 'practical and commonsense fashion,'" and the district court is entitled to "broad discretion" in making its assessment of necessity.  United States v. Alonso, 740 F.2d 862, 868 (11th Cir. 1984).  An order authorizing a wiretap "will not be overturned 'simply because defense lawyers are able to suggest post factum some investigative technique that might have been used and was not.'"  Id. at 869 (quoting United States v. Hyde, 574 F.2d 856, 867 (5th Cir. 1978)).

A wiretap may be utilized to determine the contours and dimensions of an otherwise impenetrable conspiracy, even where investigators have used conventional methods with limited success.  See United States v. De La Cruz Suarez, 601 F.3d 1202, 1214 (11th Cir. 2010) (upholding wiretap where investigators had already uncovered substantial evidence using pen registers, physical surveillance, and five confidential informants, given that agents could use wiretaps to "determine the scope of the conspiracy and all of its members" and further surveillance would increase the likelihood of discovery and searches would tip off coconspirators).  A wiretap is deemed necessary if traditional methods of investigation fail to disclose "the full extent of [the defendant's] criminal activities and his coconspirators."  United States v. Perez, 661 F.3d 568, 582 (11th Cir. 2011) (upholding a district court's denial of a

defendant's motion to suppress information obtained from a wiretap where the government had obtained evidence from confidential informants, but such evidence was not sufficient to disclose the full extent of the defendant's criminal activities.).

Agent Miranda's affidavit explains that agents considered and implemented several additional investigative methods but found them all insufficient to fully achieve the goals of their investigation.  Doc. 651-1 ¶¶ 134–74.  Specifically, Agent Miranda explained that agents had attempted physical surveillance, but the vast number of H-2A visa recipients and the remote nature of the worksites under investigation rendered physical surveillance ineffective.  Id. ¶¶ 143–51.  Likewise, Agent Miranda explained that undercover agents would be ineffective because of the small, rural locations of the worksites.  Id. ¶ 152–54.  Agents unsuccessfully attempted to contact a worker who filed a complaint through an undercover agent.  Id.  Agent Miranda explained that agents executed multiple search warrants in connection with the investigation, but historical information proved unhelpful for a timely understanding of the treatment, movement, and location of workers.  Id. ¶¶ 155–57.  Grand jury investigations would likely compromise the investigation by alerting target subjects and result in witnesses invoking their Fifth Amendment privilege to remain silent.  Id. ¶¶ 158–63.  Agents attempted other methods, such as trash searches, pole cameras, pen registers, mail covers, and financial investigations, with limited success.  Id. ¶¶ 164–74.  However, these methods did not achieve the agents' goals of discovering the full scope of the criminal activity.

The affidavit provides a detailed description of law enforcement's use of conventional investigative techniques (those reasonably appropriate under the circumstances), which had failed to furnish sufficient evidence to accomplish the goals of the investigation, and explained other methods were unnecessarily risky.  Therefore, Agent Miranda sufficiently demonstrated

the necessity of the wiretap in his affidavit.  The issuing judicial officer, therefore, properly concluded Agent Miranda had shown a sufficient "necessity" for the wiretap.

**CONCLUSION**

For the above-stated reasons, I **RECOMMEND** the Court **DENY** Bussey's request for a <u>Franks</u> hearing and **DENY** Bussey's Motion to Wiretap Evidence.

Any objections to this Report and Recommendation shall be filed within 14 days of today's date.  Objections shall be specific and in writing.  Any objection that the Magistrate Judge failed to address a contention raised in the Complaint must be included.  Failure to file timely, written objections will bar any later challenge or review of the Magistrate Judge's factual findings and legal conclusions.  28 U.S.C. § 636(b)(1)(C); <u>Harrigan v. Metro Dade Police Dep't Station #4</u>, 977 F.3d 1185, 1192–93 (11th Cir. 2020).  To be clear, a party waives all rights to challenge the Magistrate Judge's factual findings and legal conclusions on appeal by failing to file timely, written objections.  <u>Harrigan</u>, 977 F.3d at 1192–93; 11th Cir. R. 3-1.  A copy of the objections must be served upon all other parties to the action.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a de novo determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge.  Objections not meeting the specificity requirement set out above will not be considered by a District Judge.  A party may not appeal a Magistrate Judge's report and recommendation directly to the United

States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final

judgment entered by or at the direction of a District Judge.

   **SO REPORTED and RECOMMENDED**, this 27th day of January, 2025.


BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA